UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHARLES BAHATI,

        Plaintiff,

v.

SEATTLE HOUSING AUTHORITY, et al.,

        Defendants.

C11-2103 TSZ

ORDER

THIS MATTER comes before the Court on defendants' motion for summary judgment, docket no. 81. Having reviewed all papers filed in support of, and in opposition to, defendants' motion, including plaintiff Charles Bahati's response and affidavit, docket nos. 115 and 117, the affidavit of his wife, docket no. 116, his various letters, docket nos. 118, 122, and 123, and his surreply (motion to submit new evidence) and attachments thereto, docket nos. 124 and 124-1,[1] the Court enters the following order.

---

[1] Defendants have moved to strike portions of plaintiff's materials. The Court declines to strike any of plaintiff's submissions, and it has considered them to the extent appropriate. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

ORDER - 1

**Background**

From 2005 until 2012, plaintiff was a tenant in an apartment complex known as Longfellow Creek, which is owned and operated by defendant Seattle Housing Authority ("SHA"). Plaintiff's unit was on the third floor of Building G. Defendant Andrew Roach became the property manager for Longfellow Creek in 2008. Prior to April 2010, Roach and plaintiff had no memorable interaction. Bahati Dep. at 16:15-19, 18:18-21, Ex. A to Dorrity Decl. (docket no. 84-1).

According to plaintiff, in April 2010, Roach made an "unofficial visit" to his apartment to investigate a report of pigeons nesting on his deck. Id. at 16:18-24, 38:10-18. Plaintiff complains that, on this occasion, Roach knocked loudly and turned the door knob in an effort to let himself into the apartment. Id. at 40:13-17, 41:13-14. During his deposition, however, plaintiff could not recall whether he opened the door for Roach. Id. at 42:4-6. Plaintiff describes Roach's demeanor as disrespectful, calling plaintiff by his first name and referring to his wife in a way plaintiff perceived was "not honorable." Id. at 57:9-19; 67:11-15.

Roach does not recall making this "unofficial visit" in April 2010. Roach Decl. at ¶ 7 (docket no. 83). Rather, according to Roach, on June 28, 2010, he notified plaintiff in writing as follows:

> It has become apparent that you are hosting nests for pigeons and feeding the pigeons from your deck. Please stop this practice. Pigeons are not domesticated and carry disease. Additionally their feces [are] problematic to clean.

ORDER - 2

> Management will inspect your unit on Tuesday, July 6th, at 1:00 pm to inspect for your work you have done to stop feeding and hosting the pigeons on your deck.

Ex. 2 to Roach Decl. (docket no. 83-1).  SHA's rules prohibit the feeding of stray animals and wildlife, and require written permission from the property manager before a tenant may have a pet.  SHA House Rules and Policies ¶¶ 25 & 34, Ex. 1 to Roach Decl.

Roach inspected plaintiff's unit as scheduled on July 6, 2010, and observed numerous pigeons on plaintiff's deck.[2]  Roach Decl. at ¶ 9.  He decided to give plaintiff additional time to comply.  *Id.*  On September 16, 2010, Roach notified plaintiff in writing as follows:

> Observing from the sidewalk it appears that you are hosting pigeons on your deck.  Management will be by your unit on Monday, September 20th, at 10:30 am.
>
> You need to clean your deck and not host pigeons in your patio.  This is a health and safety issue for the community, as well as being an eye sore to the community.

Ex. 3 to Roach Decl.  Roach performed the scheduled inspection, but again took no action against plaintiff.  Roach Decl. at ¶ 12.  On November 15, 2010, Roach issued yet another written notice to plaintiff:

> While walking the grounds today I saw between 20-30 pigeons on your porch rail and about 20-30 more pigeons on the ground in front of your porch.  These birds seemed content there as I came back 20 minutes later and they remained on your porch.  This leads me to believe that your [sic] are either feeding or housing pigeons.

---

[2] Roach also noticed bamboo fencing on plaintiff's deck, which he asked plaintiff to remove to prevent damage to the recently repaired deck.  Roach Decl. at ¶ 25.  Plaintiff protested, indicating that other tenants also had bamboo fencing.  *Id.*  Roach did not further pursue the matter.  *Id.*  In his response to defendants' motion for summary judgment, plaintiff provides no basis for concluding that a cognizable legal claim could be premised on Roach's actions with respect to the bamboo fencing.

ORDER - 3

> I will be back to your apartment on Thursday November 18th to inspect your unit for evidence of feeding or housing pigeons. Please do not feed or otherwise encourage pigeons to be frequent visitors or stay at your porch. These animals are pests, leave messes and are also health issue [sic]. Failure to comply with this request will result in a 10-day notice.

Ex. 4 to Roach Decl. After conducting the inspection, on November 18, 2010, Roach issued a ten-day notice to comply or vacate. Roach Decl. at ¶¶ 15, 16, & Ex. 5. Roach subsequently observed plaintiff to be in compliance, no longer appearing to feed, host, or otherwise encourage pigeons to remain on his deck. Id. at ¶ 17. As a result, no further action was taken.[3] Id.

Plaintiff does not dispute that he allowed pigeons to nest on his deck. Indeed, plaintiff has submitted photographs, dated-stamped May 6, 2010, showing pigeons nesting in a crate on plaintiff's deck. Ex. to Lisbat Aff. (docket no. 116-1). Plaintiff contends, however, that the pigeons' eggs hatched, the baby pigeons flew away, the crate was removed, and the deck was cleaned on or by May 7, 2010, before the first of Roach's notices was even issued. Lisbat Aff. at ¶ 3; Bahati Aff. at ¶ 4 (docket no. 117). Plaintiff asserts that he and his wife were in Morocco between November 10 and December 3, 2010, Bahati Aff. at ¶ 8, and that the November 15 notice to enter and the November 18 ten-day notice to comply or vacate falsely accused him of hosting pigeons. Plaintiff appears to allege that the pigeons Roach observed were on the patio of another tenant,

---

[3] Plaintiff makes no allegation that the notices issued by Roach caused him to relocate to his current residence in Burien, which is not public housing. See Bahati Dep. at 7:14-18, Ex. A to Dorrity Decl. (docket no. 84-1). In fact, plaintiff testified that he and his wife intended to move out of Longfellow Creek before their interactions with Roach. Id. at 35:6-7. Plaintiff did not leave Longfellow Creek until February 2012, which was over a year after Roach's last written notice.

ORDER - 4

1  namely John Telnes, who lives on the first floor of the same building.  Bahati Aff. at ¶ 8;

2  *see* Bolar Dep. at 9:13-14, Ex. 6 to Bahati Aff. (docket no. 117-6) (Telnes lives in

3  apartment "G-104").  Plaintiff further claims he had previously advised Roach, on more

4  than one occasion, that Telnes was feeding pigeons on or from his ground-level patio and

5  Roach took no action against Telnes, who is Caucasian.  Bahati Aff. at ¶¶ 3, 6, & 7.

6        In April 2011, plaintiff filed a complaint against SHA and Roach, which was

7  investigated by the Seattle Office for Civil Rights ("SOCR") and found to lack merit.  *See*

8  Ex. C to Dorrity Decl. (docket no. 121-1) (concluding that no reasonable cause exists to

9  believe that an unfair housing practice has been committed).  Plaintiff appealed to the

10 Seattle Human Rights Commission, which remanded the matter, ruling that the SOCR's

11 investigation was inadequate and that the preponderance of the evidence did not support

12 the SOCR's conclusions.  Ex. 1 to Bahati Aff. (docket no. 117-1 at 26-31).  Before any

13 further proceedings could be conducted by the SOCR, plaintiff initiated this lawsuit in

14 King County Superior Court.  The matter was removed to this Court in December 2011.

15 Notice of Removal (docket no. 1).

16       In his complaint, plaintiff makes the following claims:  (i) discrimination and

17 retaliation in violation of 42 U.S.C. § 1983 (equal protection); (ii) discrimination on the

18 basis of race and retaliation in violation of the Washington Law Against Discrimination

19 ("WLAD"); and (iii) intentional infliction of emotional distress.  Complaint at ¶¶ 4.2, 4.5,

20 4.6, & 4.10, Ex. A to Notice of Removal (docket no. 1-1).  Plaintiff also alleges a general

21 claim of racial discrimination, *id.* at ¶ 4.4, which defendants have interpreted as raising a

22

23

ORDER - 5

claim under the federal Fair Housing Act. In addition, plaintiff seeks punitive damages against Roach. *Id.* at ¶ 4.9. Defendants move for summary judgment as to all claims.

**Discussion**

A.      **Standard for Summary Judgment**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 257 (1986). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

B.      **Discrimination**

Disparate treatment claims brought pursuant to § 1983, the Fair Housing Act, and the WLAD are analyzed under the standards developed in connection with Title VII of the Civil Rights Act of 1964. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1180 n.11 (9th Cir. 1998); *Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997); *Hines v. Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 370-71, 112 P.3d 522 (2005). In the absence of direct evidence of discrimination, courts employ the three-part burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  See <u>Surrell v. Cal. Water Serv. Co.</u>, 518 F.3d 1097, 1105 (9th Cir. 2008).  Under this three-part standard, plaintiff bears the initial burden of presenting a prima facie case of disparate treatment.  <u>E.g.</u>, <u>Harris v. Itzhaki</u>, 183 F.3d 1043, 1051 (9th Cir. 1999).  Only if plaintiff establishes a prima facie case does the burden shift to defendants to articulate a legitimate, non-discriminatory reason for their actions.  <u>Id.</u>  The burden then reverts to plaintiff to show that defendants' proffered reason is pretextual.  <u>Id.</u>

The Fair Housing Act prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race." 42 U.S.C. § 3604(b).  Plaintiff makes no contention that SHA's policy against feeding wild birds and requiring written permission before housing them was racially discriminatory, and he does not dispute that allowing pigeons to nest on his deck was a violation of the rules governing his occupancy of an apartment at Longfellow Creek.  Instead, plaintiff asserts that Roach fabricated the accusations against him.  Given the nature of plaintiff's allegation, the traditional elements of a prima facie case are inapposite.[4]  Rather, the proper inquiry is whether

---

[4] Defendants suggest that the elements of a prima facie case are:  (i) plaintiff is a member of a protected class; (ii) plaintiff had a right to house pigeons on his deck; (iii) plaintiff was denied the right to do so; and (iv) other non-minority tenants were permitted to house pigeons.  Motion at 8 (docket no. 81).  For support, defendants cite <u>Harris</u> and <u>Gamble</u>.  Neither of these cases, however, articulate a similar prima facie standard, and both cases are factually distinguishable.  <u>See</u> 183 F.3d at 1051; 104 F.3d at 305.  The Court need not decide the exact contours of a prima facie case adapted to the situation at issue because, to the extent plaintiff claims that Telnes is a comparator who engaged in similar misconduct with impunity, his contention is unsupported by the record.  No evidence has been presented that Telnes allowed pigeons to nest on his patio.  <u>See</u> Telnes Dep. at 9:23-10:1, Ex. B to Dorrity Decl. (docket no. 84-2); Roach Decl. at ¶ 21 (docket no. 83).  Plaintiff's reliance on fellow tenant Micah Bolar's deposition for the proposition that other tenants also hosted pigeons is misplaced; to the contrary, Bolar's testimony indicates that other tenants viewed pigeons and their nests as a nuisance, and they were battling to remove them using various means, including poison.  Bolar Dep. at 23:24-29:25, Ex. 6 to Bahati Aff. (docket no. 117-6).

ORDER - 7

plaintiff has presented evidence that would be admissible at trial tending to show that Roach falsely alleged plaintiff was hosting pigeons, and that plaintiff's race was a substantial or motivating factor for doing so.

Plaintiff has not made a showing that would warrant a trial of this matter. He concedes that, absent the requisite written permission, he allowed pigeons to nest on his deck. He does not dispute that a maintenance worker for SHA, Gary Anderson, was the person who first discovered the pigeons on the deck, when Anderson had entered plaintiff's unit during the spring of 2010 to effect repairs. *See* Anderson Decl. at ¶ 3 (docket no. 82). Nor does he dispute that Anderson returned to plaintiff's apartment "several weeks later" and again observed, in "apple boxes" on the deck, pigeon nests containing eggs. *Id.* at ¶ 4. In addition, plaintiff offers no evidence to contradict that Anderson advised Roach of the situation after both visits to plaintiff's residence. *Id.* at ¶¶ 3 & 4.

Plaintiff takes issue only with the number of boxes described, insisting that only one was present on the deck, not two as stated by Anderson. *See* Bahati Aff. at ¶ 4. The number of boxes, however, is not material. The uncontested facts establish that someone other than Roach saw the pigeon nests and told Roach about them during the time period when Roach began issuing notices to plaintiff. Such evidence completely undermines plaintiff's claim that Roach fabricated the accusations.[5]  *See Scott v. Harris*, 550 U.S.

---

[5] Plaintiff's suggestion that Roach was mistaken about which apartment, plaintiff's or Telnes's, contained pigeon nests is unsupported by the record. Plaintiff does not dispute that Roach entered plaintiff's unit on three separate occasions, after giving plaintiff written notice of his intention to do so. The notices identify

ORDER - 8

372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Moreover, plaintiff has proffered no link between Roach's actions and plaintiff's race. Although plaintiff complains that Roach was disrespectful by calling him by his first name, plaintiff admits that he never heard Roach say anything about his, his wife's, or anyone else's race. Bahati Dep. at 134:13-18, Ex. A to Dorrity Decl (docket no. 84-1). Plaintiff proffers no evidence that Roach referred to Caucasian tenants more formally, by surname or otherwise, and he presents no basis for concluding that Roach would concoct allegations of wrongdoing against tenants because of their race.

At most, plaintiff's materials show that Roach was not popular among the staff or tenants at Longfellow Creek. Anderson described Roach as having poor communication skills and lacking experience in property management or supervision, but indicated that he had never witnessed Roach harass a tenant based on race. Ex. 1 to Bahati Aff. (docket no. 117-1 at 25). Assistant Resident Manager Brad Hixson voiced similar concerns, characterizing Roach as "socially awkward and abrasive," lacking an understanding of how to communicate with low-income individuals, and approaching issues in a rigid

---

plaintiff's unit as "G304," Exs. 2-5 to Roach Decl. (docket no. 83-1), and plaintiff offers no reason for believing that Roach directed the notices to plaintiff's apartment, but instead entered Telnes's unit. Plaintiff relies on Roach's use of the term "porch" in the November 15 notice, but Roach appears to have used the words "deck," "patio," and "porch" interchangeably in the various notices, and the fact that Roach undisputedly made his observations from inside plaintiff's unit, as well as from the exterior sidewalk and grounds, belies plaintiff's contention that Roach was confused about where the pigeons were roosting.

ORDER - 9

"right or wrong" manner. *Id.* (docket no. 117-1 at 34). In Hixson's opinion, however, Roach is not racist, and Hixson does not believe Roach treats residents differently on the basis of race. *Id.*

In contrast, Resident Manager (and former plaintiff) Jerome Foster accused Roach of giving preferential treatment to Caucasian residents. *Id.* (docket no. 117-1 at 17-18). In his statement to the SOCR, Foster described one incident in which Roach told an Ethiopian tenant whose sister wanted to reside at Longfellow Creek that no units were available. *Id.* at 17. According to Foster, a few days later, Roach "was willing to assist" a Caucasian couple in finding an apartment. *Id.* Foster's account does not rule out the possibility that a vacancy might simply have become available during the interim. In addition, Foster does not address whether any ineligibility for housing at Longfellow Creek on the tenant's sister's part factored into Roach's response. Foster acknowledged, however, that he did not recall whether tenants other than plaintiff had nesting boxes for birds, and he offered no opinion concerning whether Roach's treatment of plaintiff was based on race.

Former Longfellow Creek tenant (and former plaintiff) Samuel Jefferson also alleged that Roach treated residents differently on the basis of race, but he gave no details, indicated repeatedly that he did not know anything about the "bird" issue, and did not sign his SOCR statement. *Id.* (docket no. 117-1 at 20-22). Likewise, fellow tenant Maria Antonieta Orellana indicated that Roach "treats Caucasians better," complaining that Roach had called her "crazy," threatened her with eviction, charged her late fees, and instructed her to remove a barbeque grill, chairs, and plants from her porch when other

tenants were not similarly admonished.  *Id.* (docket no. 117-1 at 13).  Orellana provides no basis for concluding that the eviction threats and late fees were unwarranted or were racially discriminatory.  She draws no link between the derogatory label of "crazy" and race, or between the directions about her porch items and race.  Moreover, Orellana cannot possibly know whether other tenants were told to remove things from their decks or patios.  Orellana's observation that other tenants have items on their decks proves nothing; they might simply have chosen to disregard any directions or notices.

Finally, although Longfellow Creek tenant Demitreus Parramore complained about Roach in a letter dated June 7, 2011, which is appended to plaintiff's declaration, *id.* (docket no. 117-1 at 3-5), Parramore has since clarified that she did not, in fact, write significant portions of the letter, and she does not view Roach's behavior toward her as premised on race.  Parramore Dep. at 61:2-6, 74:2-15, 80:2-81:1, Ex. 1 to Surreply (docket no. 124-1).  Instead, Parramore indicated she perceives that Roach was giving her a hard time because she is young and her Longfellow Creek unit is her first apartment.  *Id.* at 61:8-10.  In addition, Parramore testified that she was aware of other tenants who have problems with Roach and who are "not black."  *Id.* at 74:2-5.  In her deposition, she agreed that Roach might "bug" people on an "equal opportunity" basis.  *Id.* at 74:9-15.

In sum, plaintiff offers no concrete evidence of racial animus on Roach's part.  Three of the witnesses plaintiff has identified indicate that Roach's behavior is brutish but not racially motivated.  The three other individuals on whom plaintiff relies have no personal knowledge about plaintiff's hosting of pigeons or whether Roach's response thereto was discriminatory, and their accusations that Roach is racist are unsupported by

ORDER - 11

facts about which they could testify at trial.  Finally, neither plaintiff nor his wife draw the requisite link between Roach's actions and plaintiff's race.  Thus, defendants' motion for summary judgment as to plaintiff's claims of discrimination on the basis of race is GRANTED, and plaintiff's disparate treatment claims under § 1983, the Fair Housing Act, and the WLAD are DISMISSED with prejudice.

**C.    Retaliation**

Likewise, plaintiff's retaliation claims fail.  To establish a prima facie case of retaliation, plaintiff must show that (i) he engaged in a protected activity; (ii) defendants subjected him to an adverse action; and (iii) a causal link exists between the protected activity and the adverse action.  <u>Walker v. City of Lakewood</u>, 272 F.3d 1114, 1128 (9th Cir. 2001).  Plaintiff has provided no evidence of any protected conduct, or of any adverse action causally connected to any such activity.  Defendants' motion for summary judgment as to plaintiff's retaliation claims is GRANTED, and plaintiff's claims under § 1983 and the WLAD are DISMISSED with prejudice.[6]

**D.    Intentional Infliction of Emotional Distress**

Plaintiff's claim of intentional infliction of emotional distress ("IIED") similarly lacks merit.  In Washington, IIED constitutes the same tort as outrage.  <u>Kloepfel v. Bokor</u>, 149 Wn.2d 192, 193 n.1, 66 P.3d 630 (2003).  Under Washington law, the elements of

---

[6] Moreover, plaintiff's § 1983 claim against SHA is DISMISSED for failure to present any evidence of (i) a policy or longstanding practice or custom from which the alleged constitutional violation resulted; (ii) an unconstitutional action by an official with final policy-making authority; (iii) ratification by an official with final policy-making authority of a subordinate's unconstitutional conduct; or (iv) a failure to adequately train employees that amounts to "deliberate indifference" concerning the constitutional right at issue.  <u>See</u> <u>Menotti v. City of Seattle</u>, 409 F.3d 1113, 1147 (9th Cir. 2005); <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388-92 (1989); <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).

the tort of outrage are: (i) extreme and outrageous conduct; (ii) intentional or reckless infliction of emotional distress; and (iii) actual result to the plaintiff of severe emotional distress. *Id.* at 195; *Dombrosky v. Farmers Ins. Co. of Wash.*, 84 Wn. App. 245, 261, 928 P.2d 1127 (1996). The claim must be predicated on conduct that is "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kloepfel*, 149 Wn.2d at 196; *Dombrosky*, 84 Wn. App. at 261. The tort of outrage does not encompass mere insults, indignities, threats, annoyances, or petty oppressions. *Kloepfel*, 149 Wn.2d at 196. A plaintiff is assumed to be "hardened to a certain degree of rough language, unkindness, and lack of consideration." *Id.* The question whether particular conduct rises to the requisite level of outrageousness is "ordinarily a question of fact for the jury," but the Court may dismiss an IIED claim if reasonable minds could not differ as to the conclusion that the alleged behavior was not sufficiently extreme. *Dombrosky*, 84 Wn. App. at 261-62.

For the same reasons that plaintiff has failed to establish a triable claim of racial discrimination, he cannot prove an IIED claim. At most, plaintiff asserts the type of insult, indignity, or annoyance that does not give rise to tort liability. He has not shown that Roach or SHA engaged in conduct rising to the degree of reprehensibility that would permit a jury to find in plaintiff's favor on a theory of outrage. Thus, defendants' motion for summary judgment as to plaintiff's IIED claim is GRANTED, and such claim is DISMISSED with prejudice.

**Conclusion**

For the foregoing reasons, the Court ORDERS as follows:

(1)   Defendants' motion for summary judgment, docket no. 81, is GRANTED;

(2)   Plaintiff Charles Bahati's claims are DISMISSED with prejudice; and

(3)   The Clerk is DIRECTED to enter judgment in favor of defendants Andrew Roach and Seattle Housing Authority and against plaintiff Charles Bahati, to send a copy of this Order to all counsel of record and plaintiff pro so, and to CLOSE this case.

IT IS SO ORDERED.

Dated this 19th day of September, 2013.

THOMAS S. ZILLY
United States District Judge